1525

Laurel S. TISDALE, Respondent v. A. Bert PRUITT, Jr., M.D., Appellant.

(394 S.E. (2d) 857)

Court of Appeals

*Thomas Dewey Wise* and *Robert B. Ransom,* of *Wise & Cole,* Charleston, *for appellant.*

*Edward D. Bucklwy, Jr.,* Charleston, *for respondent.*

Heard June 5, 1990.

Decided July 23, 1990.

LITTLEJOHN, Justice:

In this medical malpractice action, Plaintiff, Laurel S. Tisdale, Respondent (the patient) sued Defendant A. Bert Pruitt Jr., Appellant (Dr. Pruitt) seeking damages alleged to have grown out of an unauthorized dilation and curettage (D&C). The Complaint alleges assault and battery, negligence, recklessness and willfulness and charges that the D&C was performed by the doctor without the informed consent of the patient. The Answer of Dr. Pruitt amounts to a general denial, asserting a medical emergency as justification and alleging the two-year statute of limitations as a bar to the assault and battery claim.

Among the allegations of the Complaint are found the following:

> The Defendant's conduct toward the Plaintiff was negligent, reckless, willful, and in conscious disregard of the Plaintiff's rights in the following particulars:

>     *     *     *     *     *     *

> b) In failing to read the Plaintiff's chart in order to determine that the sole purpose of her visit to him was for him to render a second opinion to Dr. Murphy concerning her intended hospital stay.

>     *     *     *     *     *     *

> d) In failing to obtain her consent prior to performing any procedures upon her other than obtaining a biopsy in order to render a second opinion to Dr. Murphy;....

The trial judge granted a directed verdict by reason of the statute of limitations as to the assault and battery cause of action, and submitted the other causes of action to the jury which returned a verdict for $5,000 actual damages plus $25,000 punitive damages. The doctor appeals. We affirm.

## FACTS

The patient had been seeing her own family physician, Dr. Murphy, for approximately ten years. She was having problems with a pregnancy and consulted him. He recommended a D&C and arranged for her to be admitted to St. Francis Hospital for a final diagnosis and for treatment under general anesthesia.

Before hospitalization insurance coverage would be afforded, her carrier required a second opinion, and she was referred by the insurance company to Dr. Pruitt. She went to his office and filled out an information sheet and told his receptionist that she was there for a second opinion. The receptionist initiated a patient's chart and indicated on it in two places that the patient was there for the purpose of a second opinion. Dr. Pruitt admitted that he did not read the chart and placed her on the examination table with feet in stirrups and proceeded not only to examine her so as to supply a second opinion but to perform the D&C. It was not completely

satisfactory, and a supplemental D&C was required thereafter, it was performed by Dr. Murphy at the hospital under general anesthesia.

It is the testimony of the patient that she preferred not to have an abortion and if the same was to be performed, she wanted it to be performed by her own doctor rather than by the second-opinion doctor whom she had never seen before.

She testified as follows:

> Q. And Mrs. Tisdale, if Dr. Pruitt had fully informed you, and asked you for permission, or asked you for your consent to perform a D&C in his office that day, would you have given that consent?
> A. No sir. No sir.
> Q. Tell the jury why not?
> A. I had known Dr. Pruitt for about fifteen minutes. I have known my doctor for over ten years, and I would never consent to have something that painful done in an office, whereas you could go to the hospital and be under general anesthesia, and be confident that everything is all right.

Dr. Pruitt does not with specificity testify as to exactly what he told the patient but says ". . . I explained everything to her. . . ." He further testified relative to the patient's consent as follows:

> Q. . . . [W]hat were the signals? What made you think that she agreed?
> A. I don't know how you would even say. What are vibes? You know, you can sometimes sense hostility, sometimes you can sense grief. Sometimes you can sense disapproval or approval. I could well have missed—I obviously misread Mrs. Tisdale's vibes or signals, or things, but when someone is really upset, that's not hard to do.

## ISSUES

While Dr. Pruitt filed thirteen exceptions as appear in the record, the gravaman of his appeal is found in his brief as follows:

> . . . Accordingly, the main issue for the Court's decision is whether the evidence presented at trial was sufficient to

sustain a verdict based on the doctrine of informed consent. In deciding this issue, the Court is asked to consider the essential elements of informed consent, whether the Plaintiff proved causation, and whether the damages awarded were proper.

Additionally, the Court is also asked to decide whether consent to a medical procedure may be implied from the patient's conduct and silence, and whether the jury should have been so instructed.

## ANALYSIS

Judge Goolsby in the case of *Hook v. Rothstein*, 281 S.C. 541, 316 S.E. (2d) 690 (1984), cert. denied, wrote a very scholarly opinion adopting the doctrine of informed consent in medical malpractice cases. Therein he set forth in detail the information which a medical doctor is required to give to his patient.

Under the doctrine of informed consent, it is generally held that a physician who performs a diagnostic, therapeutic, or surgical procedure has a duty to disclose to a patient of sound mind, in the absence of an emergency that warrants immediate medical treatment, (1) the diagnosis, (2) the general nature of the contemplated procedure, (3) the material risks involved in the procedure, (4) the probability of success associated with the procedure, (5) the prognosis if the procedure is not carried out, and (6) the existence of any alternatives to the procedure.

In a letter (written by Dr. Pruitt to Dr. Murphy after the D&C had been performed) we think that Dr. Pruitt effectively pleads guilty to negligence, recklessness and willfulness. From that letter we quote:

Again, let me say that I am most distressed that I did not realize Mrs. Tisdale was referred to the office by the Prudential Insurance Co. for a second opinion. Although my receptionist had put this on the chart, I did not notice it, and as I did not realize that D&C's required second opinions, the thought literally never occurred to me. I have been asked on numerous occasions to give second opinions on hysterectomys and other procedures but never for D&C's, especially for missed abortions.

\*    \*    \*    \*    \*    \*

I do hope that you will pardon my "goof." I only wish Mrs. Tisdale at the time I was doing the procedure, had mentioned to me more clearly why she was sent to the office. If she did, it fell on deaf ears.

An analysis of Dr. Pruitt's testimony leaves much to be desired in the way of informing a patient of facts upon which an intelligent, informed consent can be made. Assuming, without so deciding, that his disclosures meet the requirements of *Hook*, we hold that the trial judge must be affirmed because of a lack of consent on the part of the patient. The circumstance under which Dr. Pruitt would have us find that the patient consented are relevant in determining whether or not the patient should have ordered Dr. Pruitt to stop what he was doing. She was in the office of a strange doctor recommended by the insurance company. She was greatly disturbed and was crying, experiencing pain. She was on the examining table with her feet in the stirrups. The procedure lasted about five minutes.

Dr. Pruitt's own testimony relative to her acquiescence is relevant. He relies mostly on her silence. He testified as follows:

I just falsely assumed, or incorrectly assumed that this was what she was there for.

\*    \*    \*    \*    \*    \*

. . . Dewey, just for the record—and this may sound offensive, but I obviously, looking back, misread Mrs. Tisdale's feelings, but when I talked with her during the history taking, she very, very much wanted this pregnancy.

\*    \*    \*    \*    \*    \*

. . . She was just absolutely docile I guess, and I just assumed that she was acquiescing, but I thought I had her consent and her inform—very informed consent . . .

The argument of counsel that the evidence does not make at least a jury issue on whether damages were sustained and proximately caused by Dr. Pruitt's wrongful conduct is without merit. There is testimony that she suffered pain from the

procedure without anesthesia; she was deprived of her right to choose the doctor to perform her D&C; in addition, she sustained emotional injury. Both actual and punitive damages are supported by the evidence.

We hold that the evidence is not susceptible of the inference that the patient gave an informed consent, expressed or implied. Accordingly, the trial judge properly declined to charge the law of implied consent.

Affirmed.

GARDNER and SHAW, JJ., concur.